# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-3682

_____

In re: Joseph Matthias Miller

*Debtor*

------------------------------

Terri A. Running

*Appellant*

v.

Joseph Matthias Miller

*Appellee*

------------------------------

National Association of Consumer Bankruptcy Attorneys

*Amicus on Behalf of Appellee(s)*

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: October 9, 2014
Filed: February 13, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Terri Running, a bankruptcy trustee, appeals from a decision of the Bankruptcy Appellate Panel ("BAP") that affirmed the bankruptcy court's[1] conclusion that an annuity owned by bankruptcy debtor Joseph Miller is exempt from the bankruptcy estate. We affirm.

The relevant facts are not in dispute. Miller purchased an annuity from Minnesota Life Insurance Company ("Minnesota Life"). Under the annuity contract, Miller agreed to make a lump-sum "Purchase Payment" of $267,319.48 to Minnesota Life. Miller used funds from his individual retirement account to make this payment. In return, Minnesota Life agreed to make an annual "Income Payment" of $40,497.95 to Miller for the next eight years. Miller later filed for Chapter 7 bankruptcy and claimed that the annuity was exempt from the bankruptcy estate. Running objected to this classification. The bankruptcy court overruled her objection, and the BAP affirmed. This appeal followed.

When reviewing an appeal from a decision of the BAP, "we act as a second reviewing court of the bankruptcy court's decision, independently applying the same standard of review as the BAP." *In re Lasowski*, 575 F.3d 815, 818 (8th Cir. 2009). The relevant facts here are not disputed, and we review the bankruptcy court's conclusions of law *de novo*. *Id.*

_____

[1]The Honorable Gregory F. Kishel, Chief Judge, United States Bankruptcy Court for the District of Minnesota.

-2-

In his bankruptcy petition, Miller identified the funds in his annuity as exempt from the bankruptcy estate under 11 U.S.C. § 522(b)(3)(C). This exemption allows a bankruptcy debtor to protect from creditors "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section . . . 408 . . . of the Internal Revenue Code." *Id.* Section 408 of the Internal Revenue Code, in turn, provides that an individual retirement account and an individual retirement annuity are exempt from taxation; that is, they are qualified retirement plans. 26 U.S.C. § 408(a), (b), (e)(1); *Griswold v. Comm'r*, 85 T.C. 869, 871 (T.C. 1985). Thus, if retirement funds are held in either of these qualified retirement plans, then the funds can be exempted from creditors' claims in bankruptcy. This exemption generally applies even if the debtor transferred the retirement funds to the qualified retirement plan from another qualified retirement plan. 11 U.S.C. § 522(b)(4)(C) ("A direct transfer of retirement funds from 1 fund or account that is exempt from taxation under section . . . 408 . . . shall not cease to qualify for exemption under [§ 522(b)(3)(C)] . . . by reason of such direct transfer."); *id.* § 522(b)(4)(D) (explaining that § 522(b)(3)(C) applies if "[a]ny distribution that . . . has been distributed from a fund or account that is exempt from taxation under section . . . 408 . . . and [] to the extent allowed by law, is deposited in such a fund or account not later than 60 days after the distribution of such amount").

There is no dispute that the funds used to purchase Miller's annuity were retirement funds that came from Miller's individual retirement account, which was a qualified individual retirement account under 26 U.S.C. § 408(a). If Miller simply had left these funds in his individual retirement account, there is no question that the funds would be exempt from the bankruptcy estate. *See* 11 U.S.C. § 522(b)(3)(C). However, because Miller used the funds to purchase his annuity, Running contends that the funds became the property of the bankruptcy estate. Critical to Running's argument is her assertion that Miller's annuity is not a qualified individual retirement annuity as defined by 26 U.S.C. § 408(b). This provision enumerates several requirements for an annuity to be a qualified individual retirement annuity, two of

which are at issue here. First, "[u]nder the contract . . . the premiums are not fixed." *Id.* § 408(b)(2)(A). And second, "[u]nder the contract . . . the annual premium on behalf of any individual will not exceed the dollar amount in effect under section 219(b)(1)(A) [of the Internal Revenue Code]." *Id.* § 408(b)(2)(B). This amount was $6,000 for the taxable year in question. *Id.* § 219(b)(1)(A), (b)(5)(A), (b)(5)(B).

Running argues that Miller's annuity fails both of these requirements. Because Miller's annuity contract required him to pay a lump-sum amount to Minnesota Life, $267,319.48, Running characterizes the annuity's "premium[]" as "fixed," in violation of § 408(b)(2)(A). And because the annuity contract allowed Miller to pay more than $6,000 in one year for the annuity, Running urges that the annuity's "annual premium" exceeds the limit set by §§ 408(b)(2)(B) and 219(b)(1)(A). Miller responds that the funds he used to purchase the annuity, which came from his qualified individual retirement account, were not a "premium" subject to § 408(b).

We conclude that Miller has the better of this argument. A premium does not include funds, such as Miller's, that are taken from a qualified individual retirement account to pay for an individual retirement annuity. Though § 408 does not define the term "premium," § 408(b)(2)(B) sets the maximum annual premium by incorporating the amount from § 219(b)(1)(A). This linkage of statutory provisions is significant, for it conveys that an annual premium does not encompass funds that already were contributed to a qualified retirement plan. To explain, § 219(b)(1)(A) lists the maximum "qualified retirement contribution[]" that is "allowed as a deduction . . . for the taxable year." *Id.* § 219(a), (b)(1)(A). Section 219 defines a qualified retirement contribution as "any amount paid in cash for the taxable year by or on behalf of an individual to an individual retirement plan for such individual's benefit." *Id.* § 219(e)(1). Section 219(b)(1)(A) thus concerns retirement contributions being made for the first time, not the disposition of retirement contributions that were made in the past. *See also id.* § 219(d)(2). By incorporating this provision, § 408(b)(2)(B) connotes that its annual-premium limitation applies

-4-

only to funds that are being contributed to an individual retirement annuity in the first instance. It therefore follows that the term "premium" in § 408(b) does not include funds that are taken from a qualified individual retirement account to purchase an individual retirement annuity.

The distinction that § 408 draws between a "rollover contribution" and a "premium" buttresses this interpretation of § 408(b). As relevant here, § 408(d)(3) defines a rollover contribution as "any amount paid or distributed out of an individual retirement account . . . to the individual for whose benefit the account . . . is maintained . . . [that] is paid into an . . . individual retirement annuity [within sixty days]." Section 408 makes clear that a rollover contribution is distinct from a premium. Starting with the obvious, § 408 uses different terms to describe each type of payment, which, at a minimum, implies that the terms have different meanings. *Cf. United States v. Bean*, 537 U.S. 71, 76 n.4 (2002) ("The use of different terms within related statutes generally implies that different meanings were intended." (quoting 2A Norman Singer, Sutherland on Statutes and Statutory Construction § 46:06 (6th ed. 2000)). Furthermore, a rollover contribution can be "any amount," 26 U.S.C. § 408(d)(3)(A), whereas the amount of an annual premium is expressly limited, *id.* § 408(b)(2)(B). Lastly, § 408 provides that "excess contributions" to an individual retirement annuity each year are taxed but specifically excludes a rollover contribution from the calculus for determining how much an individual contributed in excess of "the amount allowable as a deduction under section 219." *See id.* §§ 408(r), 4973(a), (b)(1). For these reasons, a rollover contribution is not a premium, thus bolstering our conclusion that a premium does not include funds from a qualified individual retirement account that are used to purchase an individual retirement annuity.

Indeed, Running concedes in her brief that "if the Annuity qualifies as an individual retirement annuity under [§ 408(b)], the proceeds from the sale of the individual retirement account . . . would qualify as a 'rollover contribution' and

would be tax exempt" and therefore exempt from the bankruptcy estate. To avoid the effect of this admission, Running simply restates her position that Miller's annuity was not a qualified individual retirement annuity because Miller's lump-sum payment of $267,319.48 was "fixed" by the annuity contract and exceeded the $6,000 limit for an annual premium. But this argument assumes that Miller's payment for his annuity constituted a premium. Because we rejected this proposition for the reasons outlined above, Running effectively concedes that Miller's payment for his annuity using funds from his qualified individual retirement account was a rollover contribution under § 408(d)(3).

The only other court to consider this issue reached a similar conclusion. In *In re LeClair*, 461 B.R. 86 (Bankr. D. Mass. 2011), the court considered a bankruptcy trustee's argument that the bankruptcy debtor's payment of $86,000 for an annuity exceeded the $6,000 limit in § 408(b)(2)(B). *Id.* at 90. The court agreed with the bankruptcy trustee that this contribution exceeded the limit from § 408(b)(2)(B) but reasoned that "[t]he trustee has adduced no evidence that the $86,000 payment was a cash contribution subject to the $6,000 limitation as opposed to a rollover from some other retirement vehicle." *Id.* at 90-91. The *LeClair* court therefore recognized, as we do here, the difference between using funds from a qualified retirement plan to buy an annuity and paying a premium subject to the limitations of § 408(b). *See id.* at 91.

In support of her contrary position, Running refers us to several cases holding that an annual premium in excess of § 408(b)(2)(B)'s limit disqualifies an annuity from being treated as a qualified individual retirement annuity. But Running admitted during oral argument that none of her favored cases involved the use of funds from a qualified individual retirement account to pay for the annuity, as this case does. *See In re Cherwenka*, 508 B.R. 228, 233, 240-41 (Bankr. N.D. Ga. 2014); *In re Ludwig*, 345 B.R. 310, 312-13, 317 (Bankr. D. Colo. 2006); *In re Rogers*, 222 B.R. 348, 349-50 (Bankr. S.D. Cal. 1998).

Running raises one additional argument. She contends that even if Miller's use of funds from his qualified individual retirement account complied with § 408(b), his annuity contract still violates § 408(b)(2)(B) because it does not require Miller to pay an annual premium. As Running puts it, § 408(b)(2)(B) requires Miller to pay "multiple, annual premiums" in order for his annuity to be a qualified individual retirement annuity. We disagree. Section 408(b)(2)(B) merely states that "[u]nder the contract . . . the annual premium on behalf of any individual will not exceed [$6,000]." This provision does not mandate the payment of an annual premium for an unspecified number of years; rather, it requires that the annuity contract limit the funds being contributed in the first instance. *Cf. Sadberry v. Comm'r*, 153 F. App'x 336, 340 (5th Cir. 2005) (per curiam) ("Because the [annuity] at issue does not limit its annual premiums, it does not qualify as an individual retirement annuity according to the Internal Revenue Code or for a tax-free rollover."); *LeClair*, 461 B.R. at 88 (stating that "[t]here have been no other premiums paid" after the initial payment of $86,000). Miller's annuity agreement, which modifies his annuity contract, accomplishes this requirement. The agreement states that Miller's "annual cash purchase payment," *i.e.* his annual premium, may not exceed, as relevant here, "$2,000, or such other maximum amount as may be allowed by law." By limiting Miller's ability to pay an annual premium in this manner, his annuity contract complies with § 408(b)(2)(B).

For the reasons described above, we affirm.

_____